[Civ. No. 19960.   First Dist., Div. Two.   Nov. 21, 1962.]

ROY BONDULICH, Plaintiff and Respondent, v. O. E. ANDERSON COMPANY et al., Defendants and Appellants.

Sedgwick, Detert, Moran & Arnold and Scott Conley for Defendants and Appellants.

Boccardo, Blum, Lull, Niland & Teerlink and Edward J. Niland for Plaintiff and Respondent.

SHOEMAKER, J.—This is an appeal by defendants O. E. Anderson Company, O. E. Anderson and Florence Anderson, individually and as co-partners of said company, from a judgment in favor of plaintiff Roy Bondulich.

The facts are substantially without dispute. On December 2, 1957, the plaintiff, Roy Bondulich, was injured during the course of his employment as a hod carrier for the Knowles Plastering Company. He was working on the building of a new wing for the San Jose Hospital. The general contractor was the O. E. Anderson Company. The Knowles Plastering Company and the San Jose Steel Company were subcontractors. The plaintiff, during the course of his duties, was required to carry plaster from a portable mixer to the area where the plasterers were at work. The accident occurred when the plaintiff, in the performance of his work, passed beneath a scaffold constructed by the O. E. Anderson Company. The scaffold in question was of the "waler bracket" variety, and was equipped with wooden guardrails which were not nailed or bolted into place, but which were laid into plywood slots on top of the uprights. As the plaintiff neared the scaffold, the employees of the San Jose Steel Company were attempting to hoist a roll of steel mesh to the roof of the building by means of a pulley. Thomas, an employee of the steel company, was on the roof operating the pulley when he became aware that the roll of mesh had come into contact with the scaffolding. He then called to a co-employee to get up on the scaffolding and free the roll. While this helper was attempting to do so, the roll struck the guardrail and dislodged it. The rail fell from the scaffold and struck the plaintiff on the head.

After a trial by jury, verdict and judgment were in favor of the plaintiff and against the defendants O. E. Anderson Company, O. E. Anderson and Florence Anderson, individually and as copartners of said company. These defendants now appeal.[1]

Appellants' first contention is that the court erred in instructing the jury that violation of a certain construction safety order of the California Division of Industrial Safety constituted negligence per se. The order in question, section 1645,[2] is entitled "Light-trade Pole Scaffolds Built of Lum-

[1]It may be noted that the San Jose Steel Company and its employees, Don Thomas and Norman Goosson, were also named as defendants in this action. Judgment was entered in their favor against the plaintiff.

[2]All references in this opinion to construction safety orders of the California Division of Industrial Safety are cited from California Administrative Code, title 8.

ber'' and provides in part as follows: ''(4) Railing. Open sides and ends of working levels ten feet (10') or more above grade shall be guarded by one-inch by six-inch (1" x 6") or a two-inch by four-inch (2" x 4") railing nailed to the uprights so that the top edge is between forty-two inches (42") and forty-five inches (45") above the platform. Midrails are required under certain circumstances. . . .'' The trial court read the above-quoted portion of the order to the jury and instructed them that ''Conduct which is in violation of this Order constitutes, in itself, negligence. This means that if the evidence supports a finding, and you do find, that a person did so conduct himself, it requires a presumption that he was negligent. However, such a presumption is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable, justifiable and such as might reasonably have been expected from a person of ordinary prudence who desires to obey the law.''

Appellants contend that the giving of this instruction constituted error because the scaffold involved in the instant case was not a ''light-trade pole scaffold'' but a ''bracket'' scaffold. Appellants assert that bracket scaffolds are governed exclusively by another safety order, section 1651. This latter section, which is entitled ''Outrigger and Bracket Scaffolds,'' provides, pursuant to subdivision (d) (3), that ''Railings shall be installed on bracket scaffolds for all heights ten feet (10') or more above the ground.''

According to appellants, the significant difference between the two railing requirements is that section 1645 specifically requires that the railing be ''nailed to the uprights,'' whereas section 1651 requires only that a railing ''be installed.'' Appellants contend that the scaffold in the instant case was constructed in such a manner as to comply with section 1651, but that the court never apprised the jurors of that section and, instead, erroneously instructed them that appellants' bracket scaffold was subject to the nailing requirement of section 1645. Appellants assert that this error was so prejudicial as to require a reversal of the judgment. We do not agree.

Appellants' contention that the requirements of section 1645 are inapplicable to bracket scaffolds is based solely on the fact that the order is entitled ''Light-trade Pole Scaffolds Built of Lumber.'' It must be noted, however, that subdivision (a) (5) of section 1645 provides in part as follows: ''Plat-

forms shall be at least twenty inches (20″) wide, unless exceptions (A) or (B) apply.

''Exceptions: (A) If waler-bracket scaffolds are used only for the placing and tightening of form ties, and guardrailings are installed, single two-inch by ten-inch (2″ x 10″), or wider, planks may be used. . . .'' It seems to us that if appellants were correct in contending that section 1645 is inapplicable to bracket scaffolds, there would certainly have been no need to exempt ''waler-bracket scaffolds'' from certain of the platform requirements enumerated in the order, and further, that the very inclusion of the exemption clause indicates that the section, however titled, is not limited in application to one specific type of scaffold. Since the railing requirement set forth in subdivision (a) (4) of the section does not exempt bracket scaffolds, is it not logical to assume that they were intended to be covered?

In any event, if we concede appellants' correctness in contending that section 1651 (since specifically applicable to bracket scaffolds) is the controlling regulation in the instant case, there is no indication whatever that the section was designed to obviate the requirement that railings be nailed or otherwise permanently affixed to uprights. Appellants place great stress on the fact that the section requires only that railings ''be installed.'' However, the precise meaning of this term can be ascertained only when the section is read in conjunction with the related safety orders applicable to scaffolds in general. Section 1640, for example, is entitled ''Scaffolds, General Requirements.'' Pursuant to subdivision (i) (3), the section sets forth the minimum number of nails required for various scaffold connections. Guardrails are specifically included. Section 1615, which is entitled ''Design of Temporary Railing,'' prescribes certain standards to which all railings ''required by these orders, except as otherwise provided,'' shall conform. Subdivision (e) states that ''The rails shall be placed on that side of the post which will afford the greatest support and protection.'' Subdivision (f) provides that ''Light wood barrier members resting on barrels, boxes, or other makeshift supports shall not be used as a railing substitute.'' Surely these sections indicate that the required railings are to ''be installed'' in such a manner as to provide maximum strength and stability. Furthermore, it must be noted that the Appendix to the Construction Safety Orders contains various diagrams to be used in conjunction with the orders. Figures 29 and 30, which are apparently

illustrative of section 1651, depict two types of approved bracket scaffolds. Both scaffolds are equipped with railings *nailed* to uprights.

In the instant case, the record reveals that the guardrail on appellants' scaffold was merely laid in a plywood slot on top of the wooden uprights set in the metal brackets. It was therefore capable of being easily dislodged when any type of upward pressure was exerted against it. Appellant O. E. Anderson testified that the railing would have given way if a worker kneeling on the scaffold rose up and contacted it from beneath with his back or shoulder. He further testified that this type of railing was useful when moving material in and out of windows, because the railing could easily be removed to provide greater access. He admitted, however, that railings equipped with removable bolts could be used in a similar manner. Under such circumstances, we have no doubt that appellants failed to install their guardrail in the manner required by the construction safety orders, including section 1651.

Moreover, appellants are precluded from objecting to the giving of the instruction on section 1645. An examination of the record reveals that it was appellants, rather than respondent, who first brought section 1645 to the court's attention. In addition, appellants made no mention of section 1651 (which they now contend to be controlling), but, on the contrary, informed the court that there was no safety order applicable to bracket scaffolds. Under such circumstances, the instruction complained of was clearly "invited" by appellants themselves.

"Where a party by his conduct *induces the commission of error,* he is *estopped* from asserting it as a ground for reversal." (3 Witkin, California Procedure, Appeal, § 92, p. 2257; *Abbott* v. *Cavalli* (1931) 114 Cal.App. 379, 383 [300 P. 67].)

Further, the record shows that appellants' counsel offered section 1645 into evidence and requested that the court take judicial notice of it. He not only failed to bring section 1651 to the court's attention, but informed the court that there was no safety order specifically applicable to bracket scaffolds. By virtue of this action, appellants are estopped from asserting that the court based its instructions upon the wrong section.

Appellants' final contention is that the damages were excessive and the result of passion or prejudice. Appellants base this argument primarily on the fact that respondent

18

was awarded damages in the amount of $30,000, despite the fact that his special medical damages and loss of earnings amounted to less than $1,700. They urge that such an "overwhelming" verdict is without support in the evidence, and was only brought about by a combination of circumstances, the most prejudicial of which was the giving of the instruction involving section 1645, which we have just discussed.

The rule is well established that a jury's verdict awarding damages for personal injuries cannot be disturbed on appeal unless it is so disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion or prejudice. (*Sumrall* v. *Butler* (1951) 102 Cal.App.2d 515, 524 [227 P.2d 881]; *Eggink* v. *Robertson* (1961) 191 Cal.App. 2d 496, 502 [13 Cal.Rptr. 76].) The question is not whether the amount awarded is the amount that the reviewing court would have awarded or whether the court believes the damages awarded to be generous. (*Griott* v. *Gamblin* (1961) 194 Cal.App.2d 577, 579-580 [15 Cal.Rptr. 228].) Where, as in the instant case, the trial judge has impliedly approved the jury's award by denying a motion for new trial, the appellate court may interfere only if it appears from the record, as a matter of law, that the jury was motivated by passion or prejudice. (*Harris* v. *Lampert* (1955) 131 Cal. App.2d 751, 752 [281 P.2d 292]; *Hundley* v. *St. Francis Hospital* (1958) 161 Cal.App.2d 800, 807 [327 P.2d 131].)

Our case reveals that respondent was struck on the head by a 16-foot guardrail weighing approximately 48 pounds, which fell a distance in excess of two floors. The physicians who treated respondent stated that he had a horseshoe-type laceration approximately 3½ inches in length on the right side of his forehead that had to be sutured; that respondent complained of a pulling sensation in the back of his neck, headaches, impaired vision, and a decreased sensation of the left arm and hand; that there was a severance of the right supraorbital nerve which supplies areas of sensation to the right side of the scalp, and so he had a permanent absence of sensation in the area back of the laceration. There was also nervousness, irritability and annoyance by noise; that generally these complaints had continued for three years since the accident, and it was the doctor's opinion that these symptoms might well continue for a few more years.

Respondent's testimony was in accord with the symptoms described by his doctors. He also stated that he had lost

interest in all of his former activities since the accident, and had virtually discontinued his social life. He stated that he was unable to sleep restfully and that noises bothered him a great deal. Before the accident, he had never had any difficulty with his employers, but since the accident he had had numerous difficulties and had worked for 10 or 12 different employers.

Respondent's wife testified that her husband used to be a very happy and active man. She stated that since the accident, he had become nervous and irritable and frequently quarreled with his friends and his employers. She stated that he was unable to sleep and frequently complained of pain in his arms, head and neck. She said that they gave their pet dog to the pound because respondent was unable to tolerate its barking.

In view of this evidence, it cannot be said as a matter of law that the verdict of $30,000 was the product of passion or prejudice.

In the recent case of *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508 [15 Cal.Rptr. 161, 364 P.2d 337], the court affirmed a personal injury judgment for $187,903.75, despite the fact that $134,000 of the award was for nonpecuniary items of damage such as pain and suffering. The court stated: "There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. . . . In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record [citation]."

Judgment affirmed.

Kaufman, P. J., and Agee, J., concurred.